```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
SECURITIES INVESTOR PROTECTION        :
CORPORATION,                          :
                                      :
        Plaintiff,                    :
                                      :          12 MC 115 (JSR)
        -v-                           :
                                      :          OPINION AND ORDER
BERNARD L. MADOFF INVESTMENT          :
SECURITIES LLC,                       :
                                      :
       |Defendant.                    :
-----------------------------------x
In re:                                :
                                      :
MADOFF SECURITIES                     :
-----------------------------------x
PERTAINS TO:                          :
                                      :
Consolidated proceedings on           :
11 U.S.C. § 546(e)                    :
-----------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

JED S. RAKOFF, U.S.D.J.

Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e),

reads as follows:

> Notwithstanding sections 544, 547, [and] 548(a)(1)(B)
> . . . of this title, the trustee may not avoid a
> transfer that is a . . . settlement payment, as
> defined in section 101 or 741 of this title, made by
> or to (or for the benefit of) a . . . stockbroker, , .
> . . or that is a transfer made by or to (or for the
> benefit of) a . . . stockbroker, . . . in connection
> with a securities contract, as defined in section
> 741(7), . . . except under section 548(a)(1)(A) of
> this title.

In Picard v. Katz, 462 B.R. 447 (S.D.N.Y. 2011), and Picard v.

Greiff, 476 B.R. 715 (S.D.N.Y. 2012), the Court held that Section

546(e) applies to certain of the avoidance and recovery actions

brought by Irving Picard (the "Trustee"), the trustee appointed

1

under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa et seq., to administer the estate of Bernard L. Madoff Investment Securities LLC ("Madoff Securities"). Accordingly, the Court dismissed all of the Trustee's avoidance and recovery claims in those actions except those claims proceeding under Sections 548(a)(1)(A) and 550(a) of the Bankruptcy Code. Katz, 462 B.R. at 453; Greiff, 476 B.R. at 722-23. After the Court's decision in Greiff, the Trustee consented to entry of judgment dismissing its avoidance claims under 11 U.S.C. §§ 544, 547, and 548(a)(1)(B) in numerous adversary proceedings in which the defendants had filed a motion before this Court to withdraw the reference to the Bankruptcy Court, and in which the Trustee did not challenge the good faith of the recipients of transfers from Madoff Securities. See Consent Order Granting Certification Pursuant to Fed. R. Civ. P. 54(b) for Entry of Final Judgment Dismissing Certain Claims and Actions, No. 12 MC 115, ECF No. 109 (S.D.N.Y. May 12, 2012). Those cases are now on appeal before the Court of Appeals for the Second Circuit.

However, collateral questions about the applicability of Section 546(e) remained in many of the cases not covered by that Consent Order. These questions were jointly briefed by the remaining parties, and the Court heard oral argument on November 27, 2012. By a "bottom line" Order dated February 12, 2013, the Court, in addition to substantially reaffirming the reasoning and rulings set forth in Katz and Greiff, ruled that:

2

(1) Where the Trustee has sought to avoid transfers to an initial transferee, the avoidance of which would otherwise be barred by Section 546(e) under the Court's rulings in Katz and Greiff, the initial transferee will not be able to prevail on a motion to dismiss some or all of the Trustee's avoidance claims simply on the basis of the Section 546(e) "safe harbor" if the Trustee has alleged that the initial transferee had actual knowledge of Madoff Securities' fraud; and

(2) Where the Trustee has sought to recover transfers made to a subsequent transferee, the avoidance of which would otherwise be barred by Section 546(e) as to the initial transferee, the subsequent transferee will not be able to prevail on a motion to dismiss some or all of the Trustee's avoidance claims simply on the basis of the Section 546(e) "safe harbor" if the Trustee has alleged that the subsequent transferee had actual knowledge of Madoff Securities' fraud.

While these conclusions are implicit in the rulings in Katz and Greiff, this Opinion and Order elaborates the reasons for the Court's rulings in the February 12, 2013 Order. In so doing, the Court assumes familiarity with the underlying facts of Madoff Securities' fraud and ensuing bankruptcy. The Court recounts here only those facts that are relevant to the Section 546(e) issues.

As stated in Greiff,

> For many years prior to filing for bankruptcy, Madoff Securities — a securities broker-dealer registered with the Securities and Exchange Commission ("SEC")

3

under § 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b) — purported to operate three business units: an investment advisory unit, a market making unit, and a proprietary trading unit. Clients investing in the investment advisory unit . . . signed either a "Customer Agreement," an "Option Agreement," a "Trading Authorization Limited to Purchases and Sales of Securities and Options," or some combination of the three (collectively, the "account agreements"). Pursuant to these agreements, Madoff Securities purported to make securities investments on the clients' behalf. Accordingly, Madoff Securities sent monthly or quarterly statements to each of its investment advisory clients showing the securities that Madoff Securities claimed to hold for the client and the trades that it claimed to have executed on the client's behalf during the applicable period.

In reality, the investment advisory unit of Madoff Securities never, or almost never, made the trades or held the securities described in the statements it sent to investment advisory clients, at least during all years here relevant. Instead, Madoff Securities operated its investment advisory division as a Ponzi scheme. Thus, when clients withdrew money from their accounts with Madoff Securities, they did not actually receive returns on successful investments, but instead only the very money that they and others had deposited with Madoff Securities for the purpose of purchasing securities.

476 B.R. at 717-18 (citations and footnotes omitted). After Madoff

Securities' scheme was revealed and the Trustee was appointed to

oversee the estate pursuant to SIPA, the Trustee brought hundreds of

avoidance and recovery actions seeking to return to the bankruptcy

estate fraudulent and preferential transfers made by Madoff

Securities to its customers and others. The Trustee brought these

actions pursuant to 11 U.S.C. §§ 547, 548(a)(1)(A) & (B), and

550(a), as well as comparable provisions of New York law

incorporated by reference under 11 U.S.C. § 544(b).

4

The defendants in this consolidated proceeding argue that Section 546(e) of the Bankruptcy Code requires that the Trustee's claims pursuant to Sections 544, 547, and 548(a)(1)(B) be dismissed pursuant to Section 546(e)'s "safe harbor" that protects transfer made in relation to securities trading. As noted, this Court, in Katz and Greiff, held that Section 546(e) "precludes the Trustee from bringing any action to recover from any of Madoff's customers any of the monies paid by Madoff Securities to those customers except in the case of actual fraud." Katz, 462 B.R. at 452; see also Greiff, 476 B.R. at 718 (quoting Katz). In making this determination, the Court found that the transfers at issue were "made by or to (or for the benefit of) a . . . stockbroker, in connection with a securities contract." See Katz, 462 B.R. at 451 (quoting 11 U.S.C. § 546(e)). The Court further found that Madoff Securities qualified as a stockbroker either "by virtue of the trading conducted by its market making and proprietary trading divisions," or because Madoff Securities' customers, "having every reason to believe that Madoff Securities was actually engaged in the business of effecting securities transactions, have every right to avail themselves of all the protections afforded the customers of stockbrokers, including the protection offered by § 546(e)." Greiff, 476 B.R. at 719-20. The Court also found that "the account agreements between Madoff Securities and the defendants clearly qualify as securities contracts" under Section 741(7) of the Bankruptcy Code, either because they were made pursuant to "'a

5

master agreement that provides for' the purchase and sale of securities" under Section 741(7)(a)(x) or because the agreements "'related to an [] agreement or transaction' in securities, and they obligated Madoff Securities, a stockbroker, to reimburse customers" under Section 741(7)(a)(xi). Id. & n.6. Therefore, the Court found that Section 546(e)'s requirement that the payments be transfers "made by . . . a . . . stockbroker . . . in connection with a securities contract" was satisfied.

Furthermore, the Court alternatively found that "the defendants' withdrawals from their accounts constituted 'settlement payments' from a stockbroker and therefore fall within the coverage of § 546(e) for that independent reason." Id. at 720. As the Court stated, "[t]he Second Circuit has interpreted [Section 741(8)'s] 'extremely broad' definition to apply, inter alia, to 'the transfer of cash or securities made to complete [a] securities transaction.'" Id. at 721 (quoting Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V., 651 F.3d 329, 334 (2d Cir. 2011)). Since "what clients had contracted for was Madoff Securities' implementation of its investment strategy," their "withdrawals therefore constituted partial settlement of these securities contracts." Id.

On the foregoing basis, the Court held, both in Katz and Greiff, that Section 546(e) required the dismissal of the Trustee's avoidance claims except those brought under Section 548(a)(1)(A) and related recovery claims under Section 550(a). Notwithstanding these clear holdings, the Trustee, in briefing the instant matters,

attempts to re-litigate - or more precisely, re-re-litigate - these basic principles. See, e.g., Trustee's Mem. of Law at 52-58, No. 12 MC 115, ECF No. 370 (S.D.N.Y. filed Sept. 28, 2012). The Court once again rejects the Trustee's arguments. For example, the Court reaffirms its determination that there is no Ponzi scheme or fraud "exception" to Section 546(e). See, e.g., Greiff, 476 B.R. at 721 ("[I]n this Court's view, [an illegal conduct exception] cannot survive the broad and literal interpretation given § 546(e) in Enron."). Similarly, while the Trustee here argues that the defendants' account agreements with Madoff Securities are illegal and therefore are void and unenforceable, this argument is but a new articulation of the Trustee's previously-rejected argument in favor of a "fraud" exception to Section 546(e), which the Court once again rejects.

Turning to what is properly before the Court in the instant proceedings, the defendants who remain are primarily those whom the Trustee alleges did not act in "good faith." These defendants include both some of the initial transferees of funds from Madoff Securities (primarily, certain of Madoff Securities' direct customers) and some of the subsequent transferees of those funds - i.e., some of those who received payments from initial transferees, including investors in so-called "feeder funds" that held customer accounts with Madoff Securities. While a lack of "good faith" may mean different things in different contexts, see Katz, 462 B.R. at 454, where the Trustee has adequately alleged that these defendants

7

had, not mere suspicions, but actual knowledge of Madoff's scheme, then, as the Trustee argues, the fact that these defendants signed account agreements is meaningless for purposes of Section 546(e) – because if they knew that Madoff Securities was a Ponzi scheme, then they must have known that the transfers they received directly or indirectly from Madoff Securities were not "settlement payments." Similarly, since such defendants are alleged to have known in effect that the account agreements never led to a transaction for the "purchase, sale, or loan of a security," they therefore also must have known that the transfers could not have been made in connection with an actual "securities contract."

It must be stressed that whether the Trustee will be able to prove such actual knowledge is not before the Court. Since these are motions to dismiss, the Trustee's factual allegations, if adequately pleaded, must be taken as true. And if the allegations adequately allege that a defendant had actual knowledge of Madoff's scheme, such a transferee stands in a different posture from an innocent transferee, even as concerns the application of Section 546(e). As the Court noted in Katz, the purpose of this section is "minimiz[ing] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." Katz, 462 B.R. at 452 (quoting In re Manhattan Inv. Fund Ltd., 310 B.R. 500, 513 (Bankr. S.D.N.Y.2002)). In the context of Madoff Securities' fraud, that goal is best achieved by protecting the reasonable expectations of investors who believed

they were signing a securities contract; but a transferee who had actual knowledge of the Madoff "Ponzi" scheme did not have any such expectations, but was simply obtaining moneys while he could. Neither law nor equity permits such a person to profit from a safe harbor intended to promote the legitimate workings of the securities markets and the reasonable expectations of legitimate investors.

The Court implicitly suggested this result in Katz, by noting that those customers "who were actual participants in the fraud" would not be "entitled to invoke the protections of section 546(e)" because, unlike innocent customers, they would not have believed that the settlement payments "were entirely bona fide." Katz, 462 B.R. at 452 n.3. This, indeed, would be true not only as to full-fledged participants in the fraud, but also those who had actual knowledge of its workings (and thereby effectively participated in it by taking advantage of its workings). What Katz thus implied, the Court now makes explicit.

It should be noted, however, that it is not enough to satisfy this exception to Section 546(e)'s safe harbor for the Trustee simply to allege that a transferee did not take in "good faith." So far as the Trustee's cases are concerned, "good faith" chiefly has relevance as a statutory requirement that a defendant must meet in order to prevent a trustee from recovering certain transfers. See, e.g., 11 U.S.C. §§ 548(c), 550(b); see also Katz 462 B.R. at453. But

it nowhere appears in Section 546(e).[1] Since the language of that
section is plain, see Katz, 462 B.R. at 452, and since its purpose
is protection of the securities markets and of the reasonable
expectations of legitimate participants in these markets, id. at
452-53, the burden is on the Trustee to prove that a transferee does
not meet what the language and purpose of Section 546(e) require.
And, as the discussion above demonstrates, to do this, the Trustee
must show, at a minimum, that the transferee had actual knowledge
that there were no actual securities transactions being conducted.[2]

     Applying these principles, the Court first turns to initial
transferees and then to subsequent transferees. The principal group
of initial transferees who are part of the instant proceedings are
the "Cohmad defendants," i.e., those defendants named in the

---

[1] It may be noted that, here, as in Katz, "[b]oth sides agree that if
the defendants had actual knowledge of Madoff's scheme, it would
constitute lack of good faith." 462 B.R. at 454 (S.D.N.Y. 2011).
Conversely, here, unlike in Katz, id., both sides are not in
agreement that willful blindness equals lack of good faith. But this
is all besides the point here, because neither "good faith" nor the
lack of it is a relevant standard for determining the scope and
applicability of Section 546(e).

[2] While in some contexts "willful blindness" is sufficient to
substitute for actual knowledge, this is not such a context, for, as
noted in Katz, a securities customer has no duty to inquire as to
his broker's bona fides. See 462 B.R. at 455. Indeed, even in
situations where the claim is that the recipients of fraudulent and
preferential transfers aided and abetted a securities fraud, "the
overwhelming weight of authority holds that actual knowledge is
required, rather than a lower standard such as recklessness or
willful blindness." Rosner v. Bank of China, No. 06 Civ. 13562, 2008
WL 5416380, at *7 (S.D.N.Y. Dec. 18, 2008), aff'd, 349 F. App'x 637
(2d Cir. 2009) (quoting Pension Comm. of Univ. of Montreal Pension
Plan v. Banc of Am. Sec., LLC, 446 F.Supp.2d 163, 202 n.279
(S.D.N.Y. 2006)).

Trustee's First Amended Complaint ("FAC") filed against Cohmad
Securities Corporation ("Cohmad") and various Cohmad owners,
employees, and associates.[3] See FAC, Picard v. Cohmad Sec. Corp., No.
12 Civ. 2676, Adv. Pro. No. 09-01305 (Bankr. S.D.N.Y. filed Oct. 8,
2009). The Trustee seeks to avoid and recover under Sections 544,
547, 548(a)(1), 550, and 551 of the Bankruptcy Code approximately
$94 million in fraudulent commissions paid to Cohmad and fictitious
profits withdrawn from Madoff Securities customer accounts owned by
individuals associated with Cohmad. See FAC ¶¶ 137-42. The pertinent
allegations, viewed in the light most favorable to the Trustee, are
as follows:

For over two decades, Cohmad and Madoff Securities were closely
intertwined both personally and professionally. See FAC ¶¶ 4-5.
Cohmad was formed in February 1985 by Madoff and his friend and
former neighbor, Maurice "Sonny" Cohn, for the purpose of recruiting
customers to invest in Madoff Securities. Id. ¶ 48. Members of both
the Madoff and Cohn families served as Cohmad's officers and
directors, and the two families shared close personal relationships.
Id. ¶¶ 50, 54-56. Madoff Securities acted as an administrator for
Cohmad's employee benefits plans, and Cohmad shared office space, a
computer network, and utilities with Madoff Securities. Id. ¶¶ 108-

---

[3] The Court's discussion here applies only to those defendants in the
Cohmad actions that have moved to withdraw the reference and
therefore put their cases before this Court. See Notice of Mot. to
Dismiss at 10, No. 12 MC 115, ECF No. 259 (S.D.N.Y. filed July 27,
2012).

110. Cohmad's offices were interspersed among Madoff Securities' offices, and no signage indicated that Cohmad was a separate company. Id. ¶¶ 111-12. Unlike most Madoff Securities employees, Marcia Cohn, Sonny Cohn's daughter and a co-owner and officer of Cohmad, had access to Madoff Securities' seventeenth floor office, where the fraudulent investment advisory business was located, and records indicate that her card was used to access the seventeenth floor with regularity in the year before Madoff Securities' fraud was revealed. Id. ¶¶ 113-14.

Cohmad and Madoff Securities were understood to be the same entity by many Madoff Securities' investors. When Cohmad representatives met with potential Madoff Securities customers, they often presented themselves as registered representatives of Madoff Securities, and they at times referred to Madoff Securities' work as if it were their own. Id. ¶¶ 89, 92-94, 104. Even when they did not present themselves as working for Madoff Securities, Cohmad representatives remained involved with customers' accounts after their referral and held themselves out as personally tracking "the Madoff system." Id. ¶¶ 100, 102.

Cohmad was very successful at generating new customers for Madoff Securities: when Madoff's fraud was revealed in December 2008, approximately twenty percent of Madoff Securities' active customer accounts had been referred by Cohmad representatives. FAC ¶ 5. From 2002 through 2008, Madoff made direct payments totaling nearly $14.6 million to Sonny Cohn personally. Id. ¶ 61. From the

late 1990s through 2008, Madoff Securities made payments to Cohmad on a monthly basis, amounting to nearly $100 million, in response to Cohmad's requests for payment, in which Cohmad sought payment for "professional services" and sometimes gave no reason at all for the requests. Id. ¶¶ 60-62. Cohmad would then distribute the majority of these payments to its employees based on the value of customer accounts that the representatives had referred to Madoff Securities. Id. ¶ 65.

The "Cohmad Cash Database," a database developed by a Madoff Securities employee and maintained by a Cohmad employee, "monitored the actual cash value of each referred account without considering the fictitious profits." FAC ¶¶ 69, 73. "Importantly, in situations where [Madoff Securities] customer statements showed a positive balance due to fictitious profits, but the account was actually in a negative position because the customer had withdrawn from the account more money than the customer had deposited, the Cohmad Cash Database showed the negative account balance of the [Madoff Securities] customer account." Id. ¶ 74. The Cohmad Cash Database was also used to determine the commissions owed to each Cohmad Representative for the accounts they referred to Madoff Securities. Commission payments decreased when customer accounts experienced negative net cash activity, regardless of the fictitious profits reflected in their account statements. Id. ¶ 75. Neither Cohmad nor the Cohmad representatives ever objected to the manner in which Madoff Securities calculated these commissions. Id. ¶ 80. Based on

13

these and other such allegations, the Trustee infers "that the Cohmad Representatives were aware that customer account statements reflected fictitious profits." Id. ¶ 81.

The Trustee adds the following allegations regarding Robert Jaffe, an owner and executive of Cohmad. See FAC ¶ 14. Although Jaffe referred many customers to Madoff Securities and reports at the time indicated that Jaffe was paid by Madoff Securities for his services, neither Madoff Securities nor Cohmad have records of any such payments. Id. ¶¶ 82-83. "When asked about those fees . . . , Jaffe, in his on-the-record testimony with the Massachusetts Division of Securities, exercised his Fifth Amendment Rights and refused to answer the question." Id. ¶ 82.[4] Jaffe and Madoff Securities also "had an arrangement . . . whereby he and others close to or affiliated with him would be entitled to withdraw from [Madoff Securities] more money than he put in." Id. ¶ 84. On a number of occasions, Jaffe directed Madoff to "execute" back-dated trades in order to provide Jaffe with "fictitious gains and losses in almost exact dollar amounts requested." Id. ¶ 88. For example, on April 5, 2006, Jaffe requested from Madoff Securities a "long term gain of approximately $600,000" for one of the accounts he controlled, in response to which Madoff Securities "executed" a sale of Aetna stock on April 4, the day before the request, in order to

---

[4] In a civil case, an adverse inference can be drawn from invoking the Fifth Amendment privilege against self-incrimination. See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976).

14

yield the "long term" gain sought. Id. The Trustee alleges that
Jaffe made these demands "because he knew that such trades were
fabricated and thus any gain or loss could be accomplished with a
stroke of a key." Id.

Although the Cohmad defendants seek to have the Trustee's
avoidance claims under all but Section 548(a)(1)(A) dismissed under
Section 546(e), it is obvious that the foregoing allegations -
which, it must again be stressed, are entirely unproven but must be
taken as true for the limited purposes of this motion - sufficiently
allege actual knowledge of, and indeed participation in, every
aspect of Madoff's Ponzi scheme that, on the Court's foregoing
analysis, would negate applicability of Section 546(e). Accordingly,
the Court denies the Cohmad defendants' motion to dismiss the
Trustee's claims on the basis of Section 546(e).

With respect to the initial transferees other than the Cohmad
defendants, the Court leaves it to the Bankruptcy Court to
determine, consistent with this Opinion, whether actual knowledge
has been adequately alleged. The Court therefore turns next to the
subsequent transferees, i.e., those defendants who received
transfers of funds from Madoff Securities indirectly either from a
direct transferee (i.e., a Madoff Securities customer) or through
one or more mediate transferees.

In order to recover a fraudulent or preferential transfer of
debtor property from a subsequent transferee, the Trustee must first
show that the initial transfer of that property by the debtor is

15

subject to avoidance under one of the Bankruptcy Code's avoidance provisions (e.g., 11 U.S.C. §§ 544, 547 & 548). See 11 U.S.C. § 550(a). However, even if the initial (or mediate) transferee fails to raise a Section 546(e) defense against the Trustee's avoidance of certain transfers - either because the Trustee did not bring an adversary proceeding against that transferee, or because the transferee settled with the Trustee, or simply because that transferee failed to raise the defense - the subsequent transferee is nonetheless entitled to raise a Section 546(e) defense against recovery of those funds. See In re M. Fabrikant & Sons, Inc., 394 B.R. 721, 744 (Bankr. S.D.N.Y. 2008) ("Fundamental principles of due process require that transferees who claim an interest in . . . property . . . have a full and fair opportunity to contest claims of fraudulent transfer." (quoting Tanaka v. Nagata, 868 P.2d 450, 455 (Haw. 1994))). Furthermore, where Section 546(e) applies to the Trustee's claims, the Trustee may only proceed against a subsequent transferee insofar as he seeks to recover those subsequent transfers under Section 550(a) as to which he could have avoided the initial transfer under Section 548(a)(1)(A). See Picard v. Katz ("Katz II"), 466 B.R. 208, 214 (S.D.N.Y. 2012).

There is one caveat to this rule: to the extent that an innocent customer transferred funds to a subsequent transferee who had actual knowledge of Madoff Securities' fraud, that subsequent transferee cannot prevail on a motion to dismiss on the basis of Section 546(e)'s safe harbor. Again, this follows from the general

principles enunciated earlier in this Opinion. A defendant cannot be permitted to in effect launder what he or she knows to be fraudulently transferred funds through a nominal third party and still obtain the protections of Section 546(e). Cf. In re Int'l Admin. Servs., Inc., 408 F.3d 689, 707 (11th Cir. 2005) (rejecting a reading of Section 550(a) to require successive avoidance and recovery actions because it would encourage creditors to "design increasingly complex transactions, with the knowledge that more transfers decrease the likelihood of a successful avoidance action"). In sum, if the Trustee sufficiently alleges that the transferee from whom he seeks to recover a fraudulent transfer knew of Madoff Securities' fraud, that transferee cannot claim the protections of Section 546(e)'s safe harbor.

While the Court will not here parse through each of the complaints against various subsequent transferees party to these proceedings to see if a given complaint meets these standards – this will be left to the Bankruptcy Court – mention should be made here of the arguments presented by a group of subsequent transferee defendants who have dubbed themselves the "Financial Institution Defendants." See Consol. Mem. of Law on Behalf of Fin. Inst. Defs., No. 12 MC 115, ECF No. 257 (S.D.N.Y. filed July 27, 2012). This group of defendants argue that Section 546(e) should require dismissal of the Trustee's claims under Section 544, 547, and 548(a)(1)(B) not only on the basis of account agreements with Madoff Securities, see supra, but also because the transfers to these

17

defendants were made in conjunction with agreements that
independently satisfy Section 546(e)'s requirements.

Section 546(e) protects a transfer that is a "settlement
payment . . . made by or to (or for the benefit of) a . . .
financial institution [or] financial participant," or that is "made
by or to (or for the benefit of) a . . . financial institution [or]
financial participant . . . in connection with a securities
contract." 11 U.S.C. § 546(e). The Bankruptcy Code defines a
"financial institution" to include an entity that is "a Federal
reserve bank, or an entity that is a commercial or savings bank." 11
U.S.C. § 101(22)(A); see also Contemporary Indus. Corp. v. Frost,
564 F.3d 981, 987 (8th Cir. 2009) (finding that "a bank" "is a
financial institution"). The Bankruptcy Code includes in the
definition of a "financial participant" "an entity that, at the time
it enters into a securities contract . . . [or] swap agreement, . .
. or at the time of the date of the filing of the petition, . . .
has gross mark-to-market positions of not less than $100,000,000
(aggregated across counterparties) in one or more such agreements or
transactions with the debtor or any other entity (other than an
affiliate) at such time or on any day during the 15-month period
preceding the date of the filing of the petition." 11 U.S.C. §
101(22A)(A). Thus, where the Trustee alleges that a defendant is "a
banking institution," "a national bank," or "a nationally chartered
bank," or where the Trustee alleges that a defendant entered into a
swap agreement with collateral payments and reference amounts worth

at least \$100 million, the defendant may be deemed to constitute a protected "financial institution" or "financial participant" for the purposes of Section 546(e) on the face of the complaint.

While the Court described above what a securities contract includes as applied to the Madoff Securities account agreements, the definition of a securities contract is in fact much broader and includes, inter alia, investment fund subscription agreements and redemption requests, margin loans, and total return swaps coupled with a securities sale transaction. See 11 U.S.C. § 741(7)(A)(i), (iv), (vi) & (xiii). In the scenarios put forward here, Madoff Securities was not a party to these contracts. Rather, the Financial Institution Defendants argue that the transfers from Madoff Securities were made "in connection with" these third-party securities contracts because the transfers from Madoff Securities were made in conjunction with transactions based on those contracts.

The issue, then, is whether Section 546(e) requires that the securities contract that the transfer is made "in connection with" must be a securities contract with the debtor. Nowhere in the language of Section 546(e) is such a relationship explicitly required. This stands in contrast to other provisions of the Bankruptcy Code, such as Section 548(a)(1)(A), which explicitly focus on the intent of the debtor. See 11 U.S.C. § 548(a)(1)(A) (providing for avoidance of fraudulent transfers based on the debtor's "actual intent to hinder, delay, or defraud"). Rather, a broader reading of the securities contracts covered by the Section

19

Case 1:12-cv-02240-JSR   Document 13   Filed 04/15/13   Page 20 of 23

546(e) safe harbor is implied by the Second Court's decision in Enron, which reads Section 546(e) broadly to suggest that a transfer can be part of a chain of payments that together constitute a settlement payment. See 651 F.3d at 334-35.[5] By analogy, then, the definition of a transfer made "in connection with a securities contract" must be similarly broad. Additionally, the Court notes that the term "financial participant" is defined to include entities that have "gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more [securities or swap] agreements or transactions with the debtor or any other entity." 11 U.S.C. § 101(22A)(A) (emphasis added). The incorporation of this definition into Section 546(e) implies that Section 546(e)'s reach does not depend on the involvement of the debtor in the securities contract at issue.

Rather, the Court concludes that Section 546(e)'s requirement that a transfer be made "in connection with a securities contract" means that the transfer must be "related to" that securities contract. See Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.), 469 B.R. 415, 442 (Bankr.

---

[5] In Enron, the Second Circuit found that a settlement payment covers any "transfer of cash or securities made to complete a securities transaction." 651 F.3d at 334 (alteration and quotation marks omitted). To the extent that, for example, an initial transfer from Madoff securities to an investment fund customer and the subsequent transfer from the investment fund to its redeeming investors may together comprise a "settlement payment" under Enron, see id. at 339, that transfer may fall within the purview of Section 546(e), assuming it meets the statute's other requirements.

20

S.D.N.Y. 2012) ("It is proper to construe the phrase 'in connection with' broadly to mean 'related to.'"); cf. Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.), 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) (finding that "a natural reading of 'in connection with' suggests a broader meaning similar to 'related to'" in the context of Section 546(g), an analogue to Section 546(e)). However, this broad "related to" notion is tempered by the fact that it must be alleged that the initial transfer from Madoff Securities to, for example, its customer must itself be related to that security agreement. Thus, a withdrawal by a Madoff Securities customer caused by that party's payment obligations to a subsequent transferee under a securities contract could qualify as "related to" that later transaction under the securities contract, whereas a withdrawal that just happens to be used in relation to a securities contract a few levels removed from that initial transfer might not suffice.

Accordingly, the question at the motion to dismiss stage is whether the Trustee has alleged that that initial transfer was made in connection with (i.e., related to) a covered securities contract and to or for the benefit of a financial participant. Take, for example, a hypothetical situation in which the Trustee alleges that a withdrawal of funds by an investment fund from its Madoff Securities customer account occurred because an investor in that fund sought redemption of its investment under the terms of its investment contract.  Assuming that either the investment fund or the investor qualifies as a financial institution or financial

participant,[6] and barring other circumstances that may appear on the facts of a given case, that situation appears to fit within the plain terms of Section 546(e): an initial transfer that was "made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract."

In summary, the Court concludes that while Section 546(e) generally applies to the adversary proceedings brought by the Trustee, those defendants who claim the protections of Section 546(e) through a Madoff Securities account agreement but who actually knew that Madoff Securities was a Ponzi scheme are not entitled to the protections of the Section 546(e) safe harbor, and their motions to dismiss the Trustee's claims on this ground must be denied. Furthermore, both initial transferees and subsequent transferees are entitled to raise a defense based on the application of Section 546(e) to the initial transfer from Madoff Securities. And finally, to the extent that a defendant claims protection under Section 546(e) under a separate securities contract as a financial participant or financial institution, the Bankruptcy Court must

---

[6] Because this determination must be made on the basis of the specific allegations in the Trustee's complaint in a given adversary proceeding, the Court sets out here the general framework to be applied consistent with its other pronouncements on the application of Section 546(e), but it does not endeavor to apply these principles to the facts of each individual case. To the extent that a given defendant may qualify as a financial institution or a financial participant, but it is not alleged in the pleadings, that becomes an issue of fact that must be decided after discovery.

adjudicate those claims in the first instance consistent with this Opinion. Except to the extent provided in other orders, the Court directs that what remains of the adversary proceedings listed in Exhibit A of item number 119 on the docket of 12 Misc. 115 be returned to the Bankruptcy Court for further proceedings consistent with this Opinion and Order.

SO ORDERED.

Dated: New York, NY
April 15, 2013

JED S. RAKOFF, U.S.D.J.